# EXHIBIT J

```
                    VOLUME:  I
                    PAGES:   1 - 306
                    EXHIBITS: Per index

           UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF TEXAS
                  TYLER DIVISION

              C.A. No. 6:05-cv-424-LED-JDL
ADVANCEME, INC.,                    )
         Plaintiff                  )
                                    )
vs.                                 )
                                    )
                                    )
RAPIDPAY LLC, BUSINESS CAPITAL      )
CORPORATION, FIRST FUNDS LLC,       )
MERCHANT MONEY TREE, INC.,          )
REACH FINANCIAL, LLC and            )
FAST TRANSACT, INC.                 )
d/b/a SIMPLE CASH,                  )
         Defendants                 )
_____

              C.A. No. 6:06-cv-82-LED
ADVANCEME, INC.,                    )
         Plaintiff                  )
                                    )
vs.                                 )
                                    )
                                    )
AMERIMERCHANT, LLC,                 )
         Defendant.                 )
_____

              VIDEOTAPED DEPOSITION
                       OF
                THOMAS J. LITLE, IV
         WEDNESDAY, SEPTEMBER 6, 2006
```

### Page 122

1  it, and the performance obligation was
2  something that the fulfillment company is
3  legally required to do anyway, and that is,
4  don't charge the customer until the goods
5  are shipped.
6  Q. What are the obligations of the catalog
7  company?
8  A. In what sense?
9  Q. In the three-party agreement, did the
10  merchant have any obligations to the
11  fulfillment company?
12  A. The merchant had to pay the fulfillment
13  company for their services.
14  Q. And the obligations of Litle & Company?
15  A. We had to pay the fulfillment company on
16  behalf of the merchant and we had our normal
17  obligations as -- for routine payment
18  processing, as well.
19  Q. That were outlined in the Member Agreement?
20  A. Yes.
21        (One-page document entitled "US
22        6,941,281 B1" is marked Exhibit
23        Number 11 for Identification.)
24  Q. I'm handing you what has been marked Litle
25  Exhibit 11, which are the claims of United

### Page 123

1  States Patent 6941281. It shows -- it's
2  just the last page of the Patent Column 7
3  and 8.
4        MR. EDELMAN: I'll object to the
5  extent that you're excerpting a page from an
6  entire patent and also not showing Mr. Litle
7  the proposed construction of the terms of
8  the patent, and also not show him the
9  arguments the parties have made with the
10  file list of the patent.
11  Q. Okay, could you please read Claims 1 and 10
12  to yourself?
13        MR. SMITH: Just 1 and 10?
14  Q. Just 1 and 10.
15  A. All right.
16  Q. Do you understand those two claims?
17        MR. EDELMAN: Same objections.
18  A. I think so.
19        (Document entitled "Litle & Co.,
20        Invalidity Claim Chart, United
21        States Patent No. 6,941,281" is
22        marked Exhibit Number 12 for
23        Identification.)
24  Q. I'm handing you what has been marked Litle
25  Exhibit 12, which is a chart that we have

### Page 124

1  prepared with two columns. The left column
2  lists the claims of the patent, which is the
3  claims on Litle Exhibit 11 that you just
4  read, 1 and 10, as well as all the other
5  claims which are printed in the left column,
6  and in the right column, we've cited to
7  portions of the Litle documents that you've
8  testified here today that refer to the
9  elements of the claim that are listed in the
10  left-hand column, and what I'd like to ask
11  you to do is -- we'll go through this row by
12  row and I'd like you to read the right-hand
13  column, I'll read the left-hand column to
14  you, and ask you to tell us if what we've
15  cited in the right-hand column is accurate.
16        MR. EDELMAN: Excuse me. Before
17  you read that, can I have a representation
18  as to whether this was provided --
19        MR. GRAY: Yes, it was.
20        MR. EDELMAN: It was provided when?
21        MR. GRAY: Last week sometime.
22        MR. EDELMAN: Okay.
23        MR. SMITH: I'd like to note, we're
24  not going to object to the line of
25  questioning, certainly, but Mr. Litle is

### Page 125

1  here as a fact witness. He is not rendering
2  a conclusion on patent validity. He is here
3  simply to testify as a factual witness. I
4  just wanted to make that clear before --
5        MR. EDELMAN: And again, I want to
6  object to the extent that this is being
7  shown to Mr. Litle without the discussion of
8  what the terms are construed to mean, or the
9  parties' construction. It's misleading,
10  putting the witness in an impossible
11  situation. If you want to do it, go ahead.
12  Q. You testified that you understand the terms
13  that are used in the patent; is that
14  correct?
15        MR. EDELMAN: Same objections.
16  A. Yeah, I think so, but if we get to some I
17  don't understand, then I'll say that.
18  Q. Please do. So on Page 1 of Litle Exhibit
19  12, in the first row, the claim recites,
20  "A method for automated payment,
21  comprising."
22  A. That's not exactly a complete sentence.
23  Q. No, and what we've done, and the reason I
24  had you read Claims 1 through 10, is because
25  we have broken down the claims --

32 (Pages 122 to 125)

Page 126

1  A. Okay.
2  Q. -- and if you would like to refer back to
3     Litle Exhibit 11, right there, you can read
4     the full claim in context.
5  A. Okay.
6  Q. So "A method for automated payment," and
7     what we've listed here are all the documents
8     you've testified about today and stated
9     "Litle & Company utilized a method for
10    automated payments as repayment of
11    obligations owed by merchants either for
12    postage or cash advances." Is that correct?
13 A. Yeah, and also, the reserves and something
14    like the Hanover Direct obligation. The
15    other kinds of obligations that we've talked
16    about. So it isn't just for postage or cash
17    advances.
18 Q. Was the fulfillment center operation that
19    you just testified about, was that a method
20    of automated payment?
21 A. To the fulfillment center?
22 Q. Yes.
23 A. Yes.
24 Q. What about for the wire fee you discussed?
25 A. For the what?

Page 127

1  Q. For the wire fee; was that a method for
2     automated payment?
3  A. Yes.
4  Q. And was equipment -- payments for equipment
5     rental and purchase, was that a method for
6     automated payment?
7  A. Yes.
8  Q. Looking now at the second row of the first
9     page of Litle 12, the claim says "At a
10    merchant, accepting a customer identifier as
11    payment from the customer." Can you look at
12    the right-hand column and tell me whether or
13    not those citations from the Litle documents
14    show that a merchant accepted the customer
15    identifier as payment from the customer?
16       MR. EDELMAN: Objection. Calls for
17    claim construction, beyond the scope of the
18    testimony, misleading, lack of foundation.
19 Q. I absolutely do not want you to try to
20    construe the claims.
21       MR. EDELMAN: He has to construe
22    the claim to answer the question.
23       MR. SCHUURMAN: Why don't you ask
24    him during your cross and stop interfering.
25    Go ahead.

Page 128

1        MR. EDELMAN: I can put my
2     objections on the record.
3        MR. SCHUURMAN: Well, make them
4     short.
5        MR. EDELMAN: I will make them as
6     long as I want to make them.
7  Q. Based on your understanding after being in
8     the card processing industry for about 25
9     years --
10 A. More than that.
11 Q. I'm sorry? Longer than that?
12       MR. SMITH: 25-plus.
13 Q. 25-plus years.
14       MR. EDELMAN: Don't make him a
15    patent attorney.
16 Q. Do the --
17       MR. GRAY: I'm sorry. Is that an
18    objection?
19       MR. EDELMAN: Yes, it is.
20       MR. GRAY: I didn't hear
21    "objection."
22       MR. EDELMAN: Objection. It
23    doesn't make him a patent attorney. Go
24    ahead.
25       MR. GRAY: Please limit your

Page 129

1     objections to objections as to form.
2        MR. EDELMAN: It was a beautiful
3     objection as to form.
4  Q. Okay. Does the right-hand column, does that
5     recite citations to the documents you've
6     testified about today that show a merchant
7     accepts a customer identifier as payment
8     from a customer?
9        MR. EDELMAN: Same objection.
10 Q. Please take as much time as you need.
11 A. And the question is, at that time, did we
12    accept the customer identifier as a payment
13    for transaction, and the answer is we did.
14 Q. The merchants did or Litle & Company did?
15 A. The merchants accepted it.
16 Q. As described in the quotes in this chart
17    that you're reading?
18       MR. EDELMAN: Same objection.
19 A. Right.
20 Q. Okay. Looking at the bottom row on Page 2
21    of Litle Exhibit 12, the claim states "and
22    electronically forwarding information
23    related to the payment to a computerized
24    merchant processor." Could you please tell
25    me whether the cites in the right-hand

Page 130

1  column illustrate that Litle & Company
2  electronically -- or that the merchant
3  electronically forwarded information related
4  to the payment to Litle & Company?
5       MR. EDELMAN: Objection. Calls for
6  claim construction, beyond beyond the scope
7  of the deposition, lack of foundation.
8  A. Yes.
9  Q. And to clarify, you said that using --
10 pursuant to the Member Agreement, which is
11 Litle Exhibit 4, the merchant would accept
12 credit cards, debit cards, and charge cards,
13 such as an American Express card?
14 A. That's correct.
15 Q. And did you also testify that the merchant
16 would accept those cards using a telephone
17 and inputting the credit card number into a
18 computer?
19 A. That's one way, yes.
20      MR. EDELMAN: I just want to put an
21 objection on the record. It wasn't clear to
22 me -- vague and ambiguous as to which
23 merchants you're referring to.
24 Q. Which merchants would accept a credit card
25 via telephone?

Page 131

1  A. That's how the card-not-present merchants
2  received most of their transactions. When
3  they didn't receive them by telephone was
4  when they -- or by an order blank sent
5  through the mail. It was typically at a
6  warehouse sale or something like that. Then
7  they were operating just like a normal
8  retailer operating.
9  Q. And was the process by which those merchants
10 forwarded information, such as the card,
11 information and payment amount, to Litle &
12 Company in the authorization step in Litle
13 10, was that process different for
14 card-not-present or card-present
15 transactions?
16 A. How they actually forwarded the information
17 to us? Yeah. Actually, sometimes we got
18 the settlement information -- well, the
19 authorization process might not -- I can't
20 remember. It depended on the situation.
21 Might not have actually gone through us, but
22 we were responsible for it. It might have
23 gone directly to NDC, and then that
24 information would have come to us through
25 NDC, the authorization information, which we

Page 132

1  needed for our process, and then the
2  settlement information might have gone to
3  NDC first and then through NPC, but it was
4  part of our contract, and the settlement
5  information sometimes then went directly to
6  us. Could go any one of those ways.
7  Q. Whether the card was present or not present,
8  was the information related to the payment,
9  such as the card number and the payment
10 amount --
11 A. Yes.
12 Q. -- was that electronically forwarded?
13 A. Yes. In the card-not-present, it was always
14 directly forwarded to us.
15 Q. Electronically?
16 A. Yes. When it was card-not-present, it was
17 always forwarded electronically, but the
18 route that it took could vary, depending on
19 the circumstances.
20 Q. Okay. Thank you. On Page 3 of Litle
21 Exhibit 12, the next portion of the claim
22 states "at the computerized merchant
23 processor, acquiring the information related
24 to the payment from the merchant,
25 authorizing and settling the payment, and

Page 133

1  forwarding at least a portion of the payment
2  to a computerized payment receiver as
3  payment of at least a portion of an
4  obligation made by the merchant."
5  A. Uh-huh.
6  Q. Could you please read the citations in the
7  right-hand column, and it flows over on to
8  Page 4 and 5, and tell me whether that
9  accurately recites the portions of the
10 agreements you've testified to today.
11      MR. EDELMAN: I'm sorry. Was your
12 question getting at whether it reflects the
13 language of the Claim 10?
14      MR. GRAY: No. I asked whether it
15 accurately reflects --
16      MR. EDELMAN: Reflects the
17 agreements.
18 Q. Do you understand my question?
19 A. Yeah. You are asking -- I'll read it back.
20 As I understand it, you're asking me to look
21 at the citations and without trying to
22 interpret whether they comply with the
23 patent or not, you're asking whether those
24 citations are accurate. Is that true?
25 Q. Right.

34 (Pages 130 to 133)

**Page 134**

1  MR. EDELMAN: That's fine.
2  A. I have a question. In the first sentence,
3     it says, at the end, "Management fee to
4     Litle & Company, or order." I'm not sure
5     that's either what it says or what it should
6     have said.
7  Q. I believe that is what it says. That's
8     Litle Exhibit 7, I believe?
9       MR. EDELMAN: I'm sorry. Where is
10      the witness referring?
11      MR. GRAY: The bottom of Page 3,
12      the bottom paragraph in the right column,
13      the fourth line down.
14      MR. EDELMAN: Oh, I see it.
15  Thanks.
16  A. Yeah, I think that was a typo and it should
17     have probably said -- it should have
18     probably referred to what we were thinking
19     of setting up or maybe had set up as a
20     separate operation to do postage financing.
21  Q. Okay. Outside of Litle & Company?
22  A. Right. Well, it would have been owned by
23     roughly the same people, but it would have
24     been a separate operation.
25  Q. Do you have any other questions about the

**Page 135**

1     citations in the right column?
2  A. Yeah. I'd like to look at the definition of
3     "prepayments."
4  Q. That's in the Member Agreement?
5  A. Okay. Yes, that's accurate.
6  Q. Do all these citations on Pages 3 through 5
7     accurately reflect your understanding of
8     what the language in the left column
9     requires?
10      MR. EDELMAN: Same objections.
11  A. As I understand it, yes.
12  Q. And do you have any questions about what
13     that -- do you understand what the claim
14     language in the left-hand column is on those
15     pages?
16      MR. EDELMAN: Same objection.
17      MR. SMITH: Objection. I think
18      "claim language" is misleading. He can
19      talk about what the words say, but "claim
20      language" is a big problem.
21  Q. The language that's printed in the left-hand
22     column, do the right-hand citations
23     accurately reflect your understanding?
24  A. As a layman's understanding because lawyers
25     always interpret stuff a little

**Page 136**

1     differently.
2       MR. SMITH: He knows too well.
3       MR. EDELMAN: Objection.
4  A. And then they charge you for it.
5  Q. Your understanding, though, as someone who
6     has been in the payment processing
7     industry for 25-plus years.
8  A. I would say I understand what the left-hand
9     column is getting at and the right-hand
10    column is a reflection of exactly that --
11 Q. Okay.
12 A. -- and matches what our documentation was.
13 Q. And I'm going to be asking the same
14    questions about each row going throughout
15    this document. So beginning on Page 5,
16    would you please read the citations in the
17    right column?
18 A. The question is the same; is this an
19    accurate representation?
20 Q. Yes.
21 A. Yes, it is.
22 Q. Do those citations accurately reflect your
23    understanding of the description in the
24    left-hand column?
25      MR. EDELMAN: Same objections.

**Page 137**

1  A. Yes. I understand the computer payment
2     receiver as what I call the third party, and
3     if that's the case, yes, it does accurately
4     reflect it.
5  Q. Looking at the next row, and the left-hand
6     column begins with the Number 2 --
7  A. Uh-huh.
8  Q. -- it says "The method of claim 1 wherein
9     the accepting step comprises accepting a
10    credit card number as the customer
11    identifier." Could you please look at
12    what's cited in the right-hand column and
13    tell me if that accurately reflects the
14    Litle documents and -- well, if it
15    accurately reflects that Litle accepted
16    credit card numbers? Sorry. Let me start
17    over. That the merchants who processed
18    through Litle accepted credit card numbers.
19      MR. EDELMAN: Same objections.
20      MR. SMITH: Do you understand that
21    question?
22      THE WITNESS: I think so.
23 Q. Let me rephrase. Sorry. Could you look at
24    the citations in the right-hand column and
25    tell me whether those citations accurately

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

138
1  illustrate that Litle & Company processed
2  credit card transactions for merchants?
3      MR. EDELMAN: Same objections.
4  A. Yes. That was our service, processing
5  credit cards for merchants.
6  Q. And on Page 6 of Litle Exhibit 12, the
7  bottom row begins with the number 3, could
8  you please look at the right-hand column
9  and, disregarding the first paragraph,
10 please tell me whether those citations --
11 A. Disregarding the first paragraph?
12 Q. Right, disregarding, and was your testimony
13 earlier that Litle would process debit cards
14 on behalf of merchants?
15 A. Yes, but they weren't necessarily identified
16 as debit cards.
17 Q. Right.
18 A. In fact, they were necessarily by the
19 payment networks disguised as debit cards.
20 Q. Could you please read the citations to the
21 documents and tell me whether those
22 citations showed that Litle accepted debit
23 cards -- sorry -- that Litle processed
24 transactions where debit cards were used at
25 the merchant?

139
1      MR. EDELMAN: Same objections.
2  A. And the question again, is?
3  Q. Whether these citations in the right-hand
4  column illustrate that Litle would process
5  debit card transactions for merchants.
6  A. Yes.
7  Q. Do you know what a Smart Card is?
8  A. Yes.
9  Q. What is a Smart Card?
10 A. It's typically a card with a chip on it that
11 carries information about an individual. In
12 those days, they were talking about Smart
13 Cards carrying your medical history and all
14 kinds of stuff on it, and so they would have
15 represented a distributor database of a
16 hundred million nodes, which was in my view
17 ridiculous, and I said so on regular
18 occasions in front of a bunch of credit card
19 people. Now, it's really become a card that
20 carries personal identification
21 information. So a Smart Card is usually an
22 identification device. Prepaid phone cards
23 could be considered Smart Cards because they
24 stored information on them, but I always
25 looked at Smart Cards as those that had a

140
1  computer chip on them that did something.
2  There are cards now that carry changing
3  passwords on it, sort of like an RSA
4  password. There are cards that you can
5  stick your thumb over and it can identify
6  the fact that your thumb print is really
7  your thumb print and not somebody else's. A
8  Smart Card encompasses all kinds of stuff.
9  A Smart Card typically had to be used in
10 conjunction with some sort of terminal
11 device. So we didn't handle any Smart Cards
12 that I know, except that it's also my
13 understanding that some Smart Cards had Visa
14 or MasterCard identification numbers on
15 them, and if that case, if somebody gave
16 those Visa and MasterCard identification
17 numbers over the telephone as a
18 card-not-present card, we would handle it
19 like we'd handle any other credit card,
20 although we wouldn't necessarily know it was
21 a Smart Card.
22 Q. Could you look at Page 8 of Litle Exhibit
23 12, the very bottom line, and Page 9, and
24 tell me whether the citations to the Litle
25 documents in the right-hand column

141
1  illustrate that Litle processed charge card
2  transactions for its merchants.
3      MR. EDELMAN: Same objections as
4  before.
5  A. Yes.
6  Q. And on the row that's numbered 6, would you
7  please read the citations in the right-hand
8  column and tell me whether that accurately
9  illustrates that the merchants for whom
10 Litle would process transactions would
11 sometimes accept credit cards at their
12 warehouse sales or otherwise at the merchant
13 location?
14     MR. EDELMAN: Same objections.
15 A. Well, interestingly enough,
16 card-not-present, based on the Visa and
17 MasterCard regulations, the
18 card-not-presents were accepted at the
19 merchant location that was their office or
20 the place where they were accepting orders,
21 and that location, I think in those days, it
22 changed, had to be identified, by city and
23 state. So that was true with
24 card-not-present, but card present is more
25 obvious. Card-presents were done -- one of

36 (Pages 138 to 141)

**Page 142**

1  the things that I actually got Visa and
2  MasterCard to do was to allow us, instead of
3  putting the city and state as an identifier
4  for where the card-not-present transactions
5  came from, allowing them -- or now, it's a
6  requirement -- to put the 800 number of the
7  customer service number on it. I don't
8  remember at this time whether the actual
9  city and state was still required, but this
10 was interestingly enough true for
11 card-not-present, as well as card-present
12 transactions.
13 Q. On Page 10, Row 7, would you please tell me
14 whether the right-hand column illustrates
15 how merchants for whom Litle would process
16 transactions would electronically accept
17 cards?
18        MR. EDELMAN: Same objections.
19        MR. SMITH: It looks like, on some
20 of this, there's some editorial, as well.
21 So within the quotes is what came from the
22 documents; is that right?
23        MR. GRAY: Right.
24        MR. SMITH: Are you asking him to
25 verify what is in the parentheses?

**Page 143**

1        MR. GRAY: No.
2        MR. SMITH: Okay. So just -- I
3  just want to be --
4        MR. GRAY: Well, actually, yes.
5  Q. If we say it shows something, I'd like you
6  to verify that the quote actually does
7  show.
8        MR. SMITH: Do you understand what
9  they're asking?
10       THE WITNESS: Yes.
11 A. This is certainly what was said. The idea
12 of actually identifying a sale as a mail
13 order or a telephone order was often done,
14 not necessarily always done. We'd identify
15 each merchant or each sub-merchant by our
16 internal merchant number that we had that
17 the merchant also used. So anything that
18 would come under one merchant number would
19 be a mail order. Another sub-merchant
20 number would be a telephone number. Another
21 sub-merchant number would be a card-present
22 transaction. We'd roll all that up and
23 account for it as one merchant, but we could
24 tell where the transactions came from,
25 typically, and the merchants sometimes did

**Page 144**

1  it religiously and sometimes they didn't do
2  so well, but --
3  Q. And you earlier -- did you earlier testify
4  that some of Litle & Company's merchants
5  would have credit card terminals or card
6  terminals at the merchant location?
7  A. Yes, and we could always identify those
8  transactions, because we'd get a terminal
9  number and we knew which terminal it was
10 used, and so we'd always know that was a
11 card-present transaction. We didn't
12 necessarily always know that a
13 card-not-present transaction was a telephone
14 order or a mail order, and I frankly don't
15 think Visa and MasterCard cared about that.
16 Q. How would you receive that information from
17 the terminal?
18 A. Well, it could take several routes, but
19 electronically, the path that it took
20 would -- could take several different
21 routes. It could come right from the
22 terminal to us. It could go from the
23 terminal to NDC. It could go from the
24 terminal to NPC, and I don't really remember
25 all the ways, but we would change -- over

**Page 145**

1  time, we would change the way we did that.
2  For efficiency reasons, for cost reasons,
3  for whatever reasons, we would change that,
4  but we always received it electronically.
5  We probably received some paper
6  transactions, but I can't imagine, during
7  the whole course of our company, we received
8  more than a handful.
9  Q. Looking at Row 8 on Page 10 of Litle Exhibit
10 12, did Litle & Company ever instruct FNBL
11 to accumulate payments until a certain
12 amount is reached before forwarding
13 payments?
14       MR. EDELMAN: Objection. Calls for
15 claim construction, mischaracterizes the
16 claim.
17 Q. Do you understand that language, Mr. Litle,
18 "accumulate the payments"?
19       MR. EDELMAN: Same objection.
20       MR. SMITH: Well, I think it's a
21 couple of questions. So do you want him to
22 answer your question or do you want him to
23 comment on the text that's written here next
24 to --
25       MR. GRAY: Comment on my question.

### Page 146

1  Q. You can disregard the text on the right-hand
2     side.
3         MR. SMITH: Okay. Ignore what is
4     on the paper. Can you read the question
5     back, please.
6         (The following question was read
7         back by the court reporter:
8         "Looking at Row 8 on Page 10 of
9         Litle Exhibit 12, did Litle &
10        Company ever instruct FNBL to
11        accumulate payments until a certain
12        amount is reached before forwarding
13        payments?")
14 A. I'll answer that in two parts. The first
15    part is, we did accumulate transactions.
16    Some of our customers would send us --
17    they'd go through a cycle every day. Some
18    of them would go through a cycle every ten
19    minutes, and based on the way transactions
20    are settled, you know, they're all settled
21    in a batch, that's all batch is today, even,
22    and we would settle them through the Visa
23    and MasterCard network. Also, multiple
24    times during the day, but somebody like
25    Micro Warehouse would send us batches every

### Page 147

1     ten minutes, and we would accumulate those
2     until it was convenient or until the next
3     time we settled it through the Visa and
4     MasterCard networks. Now, that wasn't
5     necessarily accumulating it until a
6     pre-determined amount was reached. It was
7     accumulating it until either we wanted to
8     get them in under the day's fiscal cutoff or
9     for the next time we -- our next cycle we
10    had to settle through Visa and MasterCard.
11    We probably had three or four times a day,
12    we did that.
13 Q. Okay.
14 A. Now, as far as accumulating payments until a
15    pre-determined amount is reached, we really
16    didn't do that, as far as I can tell.
17 Q. Looking at Row 9 on Page 10, you just
18    described that Litle & Company would often
19    instruct FNBL to forward the payments -- or
20    to settle the payments and forward the
21    payments daily; is that correct?
22 A. What we did is we settled the payments --
23    when I said go to the Visa/MasterCard
24    networks, that, in those days I think was
25    through FNBL. They were operating as our

### Page 148

1     gateway into the networks, and so we would
2     settle with them multiple times. Maybe we'd
3     only settle with them once. I don't
4     remember. I know when we were settling
5     directly through Visa and MasterCard, we did
6     settle with them multiple times.
7         Now, we didn't -- the part of when
8     we would electronically transmit the data to
9     the merchants or the third parties, that was
10    kind of independent of that. The dollar
11    value would accumulate or the dollar value
12    would show up in the First National Bank of
13    Louisville account as a funds transfer in
14    bulk. They were just one big number that
15    came in from Visa, one number that came in
16    from MasterCard, and then we'd sort it out
17    according to our own accounting records.
18    Maybe I don't understand the question.
19 Q. Was there a particular event that would
20    trigger an electronic forwarding of money
21    from FNBL to a merchant or to a third
22    party?
23 A. Our instruction.
24 Q. And what was a typical instruction?
25 A. It would be, at this point in time -- "On

### Page 149

1     this day, transfer this amount to that
2     account, this account to that account," and
3     it was just a list of amounts and accounts
4     that we would transfer.
5  Q. Would it forward -- would it transfer those
6     amounts daily, for example?
7  A. Yes. That cycle was done every day.
8  Q. Okay. Looking at Line 9 on Page 10, the
9     quote that begins "In consideration of
10    Litle & Company making advances," if you
11    look at the second line from the bottom of
12    that quote on Page 11, it says, small Roman
13    Numeral ii, "The daily repayments shall be
14    deducted from daily net proceeds."
15 A. Uh-huh.
16 Q. Does that show that FNBL would forward
17    payments to the merchant daily and deduct --
18    well, does that show that FNBL would forward
19    payments, net proceeds, daily to the
20    merchant?
21 A. Based on our instruction, we would say
22    "Forward this amount of money, some amount
23    of money, to the merchant." FNBL did not
24    know what the components of that money was.
25    From our point of view, our instructions

**Page 150**

1  would say "Forward the daily net proceeds,
2  less any of the other obligations of the
3  merchant." The other obligations could be
4  for chargebacks that had actually already
5  been withheld by the networks, it could be
6  for our fees, it could be for payment of
7  postage advances, it could be for payment of
8  terminals, it could be to increase increase
9  the reserve account. It could be all kinds
10  of stuff --
11       THE VIDEOGRAPHER: Five minutes
12  left on tape.
13 A. -- but when you say FNBL forwarded an
14  amount, they forwarded what we told them.
15  It was the sum of all those components.
16 Q. Would you instruct FNBL to forward those
17  payments to the third party?
18 A. Yes.
19 Q. Daily?
20 A. Yes.
21 Q. For example --
22 A. It depended. Actually, sometimes we did do
23  it weekly, so we would -- I guess we
24  would -- yeah, most of the time we did it
25  daily. Frankly, we tried to do everything

**Page 151**

1  daily. We tried to deal with interchange
2  daily. We tried to deal with all this stuff
3  daily, because that was easiest for the
4  merchant if everything happened all at the
5  same time. We'd sort out the fact that Visa
6  actually charge dollars us for interchange
7  once a month. There were all kinds of
8  different timing arrangements that were in
9  there, and for a merchant to try and figure
10  that all out, it was difficult, so we tried
11  to do everything daily for the merchant. .
12 Q. But if not daily, was it typically on some
13  other periodic basis?
14 A. Yes.
15       MR. GRAY: We can go ahead and
16  change the tape.
17       THE VIDEOGRAPHER: The time is
18  2:08. This is the end of Cassette 2. We
19  are off the record.
20       MR. SMITH: We'll take five.
21       (Recess.)
22       THE VIDEOGRAPHER: The time is
23  2:17. This is the beginning of Cassette
24  Number 3 in the deposition of Thomas Litle.
25  We are on the record.

**Page 152**

1 Q. (Cont'd. By Mr. Gray) Mr. Litle, I'd like
2  you to look back at Litle Exhibit 11, and
3  again, read Claim 10 to yourself slowly.
4  When the language -- when the claim recites
5  "means" for something, that means it's
6  reciting an apparatus or equipment that is
7  used for performing a particular function,
8  and what I'd like to ask you is, for each of
9  those portions of a claim, and I'll begin
10  with "means for accepting a customer
11  identifier as payment for the customer."
12  I'd like you to tell me whether there was
13  standard equipment used in the industry for
14  performing a particular function. Do you
15  understand?
16 A. I think so.
17       MR. EDELMAN: I object. Also, it
18  calls for claim construction.
19 Q. Was there standard equipment used in the
20  industry for accepting a customer identifier
21  as payment from the customer?
22       MR. EDELMAN: Same objections.
23 A. There were standards. There were several
24  types of equipment. The one we dealt with
25  most was an order processing system that was

**Page 153**

1  basically a terminal and an operator would
2  key in the order. The software that managed
3  that computerized order entry system was
4  often sold to the direct marketers by a
5  third party, and there are limited numbers.
6  Sometimes direct marketers wrote their own
7  software. They used different equipment,
8  but it was all basically what one would
9  consider a relatively standard order entry
10  system.
11 Q. And to clarify, was that a computer keyboard
12  where someone would input a number --
13 A. Yes.
14 Q. -- into a computer?
15 A. Uh-huh. That was one way.
16 Q. What was another way?
17 A. Another way was to actually use terminals
18  and probably five years before the period of
19  time we're talking about, which I think is
20  1992, that range, the computerized order
21  entry systems really didn't accept credit
22  cards, so terminals were used in parallel
23  with the computerized order entry system,
24  but by 1992, it was generally order entry
25  systems that were built to accept credit

39 (Pages 150 to 153)

**Page 154**

1  cards, to check the validity, the mechanical
2  validity. The Visa and MasterCard
3  transactions were 16 characters long and
4  started with a 4 and a 5 respectively, and
5  had a 10-check digit at the end, and that
6  kind of stuff, and that was most of the
7  card-not-present transactions.
8  Q. And Litle & Company processed -- did Litle &
9  Company process card transactions for
10  merchants who accepted credit cards or cards
11  via terminals or computer keyboard input?
12  A. Yes. The terminals was -- we certainly
13  did. That was a smaller part of our
14  business.
15  Q. What sort of hardware did merchants use to
16  electronically forward information related
17  to the payment to Litle?
18  A. They used -- on their computers, they had
19  connections to either -- in those days, they
20  had connections to either a frame relay
21  system, which was something supplied by the
22  telephone company, or a regular dial-up
23  telephone, and those transactions would get
24  conveyed to us via those kinds of
25  telephone-operated networks.

**Page 155**

1  Q. Okay. How would Litle receive that
2  information from the merchant?
3  A. We would also be connected to either a plain
4  dial-up line, and the merchant would call
5  the number, our number, basically, make a
6  telephone call, and we'd have a modem
7  connected to that and we'd receive the
8  merchant's data, or we'd be connected to the
9  other end of a frame relay circuit and
10  accept the information from the merchant, or
11  in some cases, we actually had a lease line
12  between the merchant and us, and so it was
13  just like a -- the phone company provided
14  it, but it was like a wire between us and
15  the merchant.
16  Q. What hardware was used for authorizing and
17  settling the payment at each of the entities
18  involved in the process?
19      MR. EDELMAN: Objection. Calls for
20  claim construction.
21  A. The -- what hardware was --
22  Q. -- was used by each entity in the process
23  outlined in Litle Exhibit 10, and I'm just
24  asking generally.
25      MR. SMITH: You mean, each of

**Page 156**

1  the --
2  Q. Right. For example, computers, network and
3  modem.
4  A. Well, that's it. It was the way the
5  transaction was captured, whether it was in
6  an order entry system or a terminal, the way
7  it was transmitted, whether it was connected
8  by modem or to a lease line -- a modem to a
9  dial-up line. It was actually modems to a
10  frame relay line or connected to a lease
11  line at the merchant's end. Basically, the
12  reverse of that at our end to receive the
13  information, and the information went back
14  and forth. When a merchant would send in a
15  settlement file, for example, then we had to
16  send back a confirmation that what they
17  thought they sent us, we actually got, and
18  that was the moment in time, when we sent
19  back that confirmation, when we owned the
20  transactions.
21  Q. And you testified earlier to this, but what
22  hardware was used -- sorry. Let me start
23  over. How was the money forwarded from FNBL
24  to the third party in your diagram in
25  Exhibit 10?

**Page 157**

1  A. Either through a wire transfer, which was,
2  a wire transfer system is operated by the
3  Fed -- it's the way banks typically transfer
4  money between each other -- or by the ACH --
5  an ACH system, which means automated
6  clearinghouse, and I think that's operated
7  by the Fed -- no. It's operated by an
8  organization called NACHA, National
9  Automated Clearinghouse Association, or
10  something like that, and which really did
11  the same thing as a wire did, except it took
12  a day longer.
13  Q. In each of the examples that you've
14  testified to here today, is the equipment
15  that is used by each of the entities in
16  Litle Exhibit 10, is that -- is it the same
17  equipment?
18  A. Pretty much. Depending on the
19  circumstance. If it was the same
20  circumstance, it would be the same type of
21  equipment. I mean, we would have ten people
22  transmitting files at the same time, so
23  there were ten instances in the same
24  equipment, but --
25  Q. Okay. In other words, did the equipment

**Page 158**

1 change between the Hanover finance situation
2 and the postage finance situation, for
3 example?
4 A. It could because it just depended on how
5 Hanover would receive payments. Maybe they
6 received an ACH. Maybe they received a
7 wire. I don't remember how they did that.
8 Q. Either way, it was an electronic transfer?
9 A. Yes.
10    MR. GRAY: I'll pass the witness.
11    (Discussion off the record.)
12       CROSS-EXAMINATION
13 by Mr. Edelman:
14 Q. Good afternoon.
15 A. Hi.
16 Q. I am Mike Edelman. I will be asking you
17 questions on behalf of Advanceme. Could you
18 put Litle Exhibit 11 back in front of you?
19 Now, I believe you testified earlier that
20 you thought, at least from your perspective,
21 that you understood what Claims 1 and 10
22 encompassed?
23 A. Uh-huh.
24 Q. Is that correct?
25 A. Not from a lawyer's point of view, but

**Page 159**

1 from --
2 Q. From your point of view?
3 A. -- from a layman's point of view, yeah.
4 Q. All right. Does your company perform the
5 inventions in Claims in 1 and 10?
6    MR. SMITH: I'm going to object and
7 I'm going to instruct the witness not to
8 answer to the extent that the answer would
9 reveal confidential proprietary information.
10 To the extent that it would not it, you may
11 answer. He's here in his personal capacity;
12 not as a representative of the current Litle
13 & Company. So with that caveat, the
14 question again?
15 A. So I'm going to get sued if I say yes;
16 right?
17 Q. I'm asking --
18 A. No, we don't.
19 Q. You do not, and why do you not perform the
20 inventions in Claims 1 and 10 in your
21 current business?
22 A. Because our company is a relatively new
23 company and the process by which we build
24 our system is building it up sequentially to
25 serve the needs of our early customers, and

**Page 160**

1 we haven't really gotten to that aspect of
2 what we -- what we think our service will
3 be. I don't know if we'll ever perform
4 that. We may. We may not.
5 Q. When you say "that," do you mean providing
6 payments to third parties?
7 A. Yes.
8 Q. Do you have an option that's advertised on
9 your website called Dynamic Settlement?
10 A. It's not active. Dynamic Settlement, no, we
11 don't --
12 Q. What is Dynamic Settlement?
13 A. Huh?
14 Q. What is Dynamic Settlement?
15 A. Actually, I don't remember what Dynamic
16 Settlement is.
17 Q. Doesn't Dynamic Settlement, as described on
18 your website, describe payments to third
19 parties?
20    MR. SMITH: Objection. Same
21 instruction. You're here in a personal
22 capacity; not as a representative of the new
23 Litle & Co.
24 A. Okay. Providing payments to third parties.
25 We do that in the sense that we maintain

**Page 161**

1 reserves, we maintain -- we do some of the
2 stuff we're talking about. We don't do
3 postage financing.
4 Q. Do you believe that maintaining reserves for
5 third parties is not performing Claims 1 and
6 10?
7    MR. SMITH: Objection.
8 A. I think that's -- I think that's an
9 interpretation of the patent and that's not
10 why I'm here.
11 Q. You didn't seem to have any problem with the
12 other side's questions.
13    MR. SMITH: Object to the
14 characterizations.
15    MR. GRAY: I never asked --
16 Q. Mr. Litle, is there any way to perform
17 Claims 1 and 10, other than postage
18 financing?
19    MR. SMITH: Objection. You're
20 asking about his interpretation again.
21 Q. In your layman's perspective.
22 A. Is there any way to what?
23 Q. Perform Claims 1 and 10, other than by
24 postage financing.
25 A. Sure.

306

```
1    COMMONWEALTH OF MASSACHUSETTS
2    MIDDLESEX, SS.
3
4         I, Denise M. Rae, a Certified
5    Shorthand Reporter and Notary Public duly
6    commissioned and qualified within and for
7    the Commonwealth of Massachusetts, do hereby
8    certify:
9         That THOMAS J. LITLE, IV, the
10   witness whose deposition is hereinbefore set
11   forth, was duly sworn by me, and that such
12   deposition is a true record of the testimony
13   given by the witness to the best of my
14   skill, knowledge, and ability.
15        IN WITNESS WHEREOF, I have hereunto
16   set my hand and my affixed notarial seal
17   this 8th day of September, 2006.
18
19            _____
20                  Denise M. Rae
21                  Notary Public
22
23   My commission expires:
24   January 16, 2009
25
```